**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| **IN RE: BLACKBAUD, INC. CUSTOMER DATA SECURITY BREACH LITIGATION** | **Case No. 3:20-mn-02972-JMC**<br><br>**MDL No. 2972** |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR CORRECTIVE NOTICE**

**REDACTED VERSION**

**TABLE OF CONTENTS**

I.     Background ........................................................................................................ 3

    A.     Blackbaud negotiated a ransom but never got confirmation the data was
destroyed. ............................................................................................ 3

    B.     The omissions and falsehoods in the Website Notice and Notices to
Social Good Entities. ........................................................................... 6

        1.     Blackbaud's data breach notice was designed as a public
relations strategy to tout Blackbaud's supposed victory over a
ransomware attacker. ................................................................ 7

        2.     Blackbaud issued an updated notice that did not correct its prior
deficiencies. ............................................................................ 10

        3.     Blackbaud's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮ the data breach notices provided to its customers
and the public. ......................................................................... 13

        4.     Blackbaud's "risk of harm" analysis is insufficient; ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ ............................................................. 14

II.    Argument ........................................................................................................ 17

    A.     Legal Standard ................................................................................... 17

    B.     Corrective Notice is Necessary .......................................................... 18

        1.     Blackbaud's Notice Was Inaccurate and Misleading .............. 18

    C.     The Court has broad authority to order corrective notice. ................... 21

    D.     The proposed form and manner of notice is appropriate. .................... 24

III.   Conclusion ...................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Bedolla*,
  787 F.3d 1218 (9th Cir. 2015) .........................................................................................17, 21

*Cheverez v. Plains All Am. Pipeline, L.P.*,
  No. CV15–4113 PSG, 2016 WL 861107 (C.D. Cal. Mar. 3, 2016) ..................................18, 22

*Gulf Oil Co. v. Bernard*,
  452 U.S. 89 (1981)..............................................................................................................21

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995)..................................................................................................24

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on Apr. 20, 2010*,
  No. 10-md-02179, 2011 WL 323866, . (E.D. La. Feb. 2, 2011) .......................................21, 23

*Keystone Tobacco Co., Inc v. U.S. Tobacco Co.*,
  238 F. Supp. 2d 151 (D.D.C. 2002) ....................................................................................21

*Koby v. ARS Nat'l Servs., Inc.*,
  846 F.3d 1071 (9th Cir. 2017) .............................................................................................24

*Marino v. CACafe, Inc.*,
  No. 16-CV-6291 YGR, 2017 WL 1540717 (N.D. Cal. Apr. 28, 2017)............................22, 24

*O'Connor v. Uber Techs., Inc.*,
  No. 13-cv-03826-EMC, 2017 WL 3782101 (N.D. Cal. Aug. 31, 2017) ...............................17

*Pohl v. MH Sub I, LLC*,
  332 F.R.D. 713 (N.D. Fla. 2019) ...........................................................................................7

*Ralph Oldsmobile Inc. v. Gen. Motors Corp.*,
  No. 99 Civ. 4567(AGS), 2001 WL 1035132 (S.D.N.Y. Sept. 7, 2001) .................................21

*Romano v. SLS Residential Inc.*,
  253 F.R.D. 292 (S.D.N.Y. 2008) ..........................................................................................17

*Slamon v. Carrizo (Marcellus) LLC*,
  No. 3:16-CV-2187, 2018 WL 3615989 (M.D. Pa. July 27, 2018) ...................................18, 22

**Rules**

Fed. R. Civ. P. 23 ................................................................................................ *passim*

Fed. R. Evid. 201 ..............................................................................................................7

**Other Authorities**

The Bluebook: A Uniform System of Citation R.18.2.1(d) ...............................................7

Colum. L. Rev. Ass'n et al. eds., 21st ed. 2020 .............................................................7

Fed. Prac. & Proc. § 1793 ..............................................................................................18

Manual for Complex Litigation § 21.31 (4th ed.) ...........................................................18

Newberg on Class Actions, §§ 8:26, 19:2 ...............................................................18, 24

Data breach notifications are not supposed to be public relations opportunities. Victims of data breaches—like the millions of class members whose private information was stored on Blackbaud's servers—need to have timely and accurate information about a breach in order to take steps to protect themselves.[1] That did not happen here. Blackbaud made false and misleading statements about the data breach—the topic of this litigation—that Plaintiffs have uncovered in discovery. The Court, as fiduciary to the class, should order that corrective notice be issued to prevent further harm to class members.

Blackbaud made a number of material misrepresentations to the public about the data breach at issue in this case. Chiefly, Blackbaud informed the public (and its customers) that it made a ransom payment for the promise that data stolen by hackers in a months-long attack was deleted. But Blackbaud ████████████████████████. Beyond that, Blackbaud made misrepresentations about what type of information was taken in the breach, and performed an unreliable risk of harm analysis that did not actually take into account the harm class members faced as a result of the breach. Blackbaud's data breach notices were designed to tout cybersecurity that was woefully deficient, and brag about its ability to "stop" a ransomware attack that never successfully locked Blackbaud out of its files. Given the wide gap between the extent of the data breach and Blackbaud's misleading statements apparently designed to lull the public and the class into a false sense of security, Plaintiffs move this Court to order correction of those misstatements. The Court, in its fiduciary role to the class, can require such a correction.

---

[1] The Federal Trade Commission notes that consumers could take a number of actions in response to a breach involving the same types of information: changing passwords, setting up credit monitoring, freezing credit, or more closely monitoring accounts. Fed. Trade Comm'n, Data Breach Response: A Guide for Business (Feb. 2021), *available at https://www.ftc.gov/tips-advice/business-center/guidance/data-breach-response-guide-business*.

1

During Blackbaud's ransom negotiations with the anonymous cybercriminal back in 2020, the cybercriminal promised Blackbaud that ████████████████████████████ ████████████████████████████████████████████████████████ ██████████████. ██████████████████████ Blackbaud downplayed the risk, and represented to the public and the class that the cybercriminal had not accessed sensitive data like Social Security numbers and banking information. But the cybercriminal had accessed and exfiltrated this sensitive data. Likewise, Blackbaud represented to this Court that consumers' data had not been found on the dark web. But the hacker ████████████████████████████ ████████████████████████████.

When Blackbaud learned that ██████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ But for the class members in this case, Blackbaud ██████████████████████████████ ████████████████████████████████████████. This wrong needs to be immediately remedied so that class members know the risk they are facing and can appropriately safeguard their sensitive information.

To rectify the harm caused by Blackbaud's deficient—and inaccurate—notice to its customers and the public, Plaintiffs seek the Court's approval to disseminate corrective notice in the form attached as Exhibit A. Plaintiffs seek Court approval out of respect for the Court and its management of the litigation and to be sure that the Court approves of the form and manner of the

notice, which is permissible both under the Court's inherent authority and under Federal Rule Civil

Procedure 23(d).[2]

## I.     Background

### A.     Blackbaud negotiated a ransom ████████████████████████ ████████.

The data breach was much more sophisticated, more detrimental, and more invasive than

Blackbaud has publicly acknowledged. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████[3] ████████████████████████

████████████████████████[4] ████████████████████

████████████████████████████████████████

████████████████████████████████[5] ████████████████

████████████████████████████████████[6] ████

████████████████████████████████████████

---

[2] Plaintiffs first requested to meet and confer with Blackbaud about the motion on January 28, 2022.  Over the next several days, the parties exchanged correspondence regarding the relief Plaintiffs sought, and the authority for same, and discussed via telephone on February 3, 2022. Plaintiffs await Blackbaud's position on this motion.

[3] Deposition of Rich Friedberg (attached hereto as "Exhibit B") at 47:25-48:14; Defendant's Revised Fact Sheet (attached hereto as "Exhibit B") at 16.

[4] Exhibit B at 72:16-73:5, 76:17-24; May 14, 2020 Message Log (attached hereto as "Exhibit D") at 3, 4.

[5] *Id.* at 28:4-12.

[6] *Id.* at 24:23-25:7.





---

[7] Exhibit B at 42:7-16, 121:10-23, 158:23-159:10; Ransom Note Email (attached hereto as Exhibit E); May 20-21 Message Log (attached hereto as Exhibit F) at 13; July 16, 2020 Message Log (attached hereto as Exhibit G); Exhibit G at 16.

[8] Exhibit B at 34:6-9.

[9] ████████████████████████████████████████████████████████████████ Exhibit B at 33:6-34:20, 263:20-264:2, 267:21-268:18; ████████ Post-Incident Handling Report (attached hereto as "Exhibit H"); August 27, 2020 Correspondence (attached hereto as "Exhibit I") at 7.

[10] Exhibit B at 33:20-34:6,104:22-105:10, 264:3-265:20; Exhibit F at 9 ████████████████████████████████████████████████████████████ ; Exhibit H at 7.

[11] *Id.*

[12] Exhibit B at 286:10-18, 288:18-289:3l; ████████ Comment Log ████████ (attached hereto as "Exhibit J").

[13] Gary Guthrie, *Paying to Delete Stolen Data Doesn't Always Work Out for the Victim, New Study Suggests*, ConsumerAffairs (Nov. 5, 2020), *https://www.consumeraffairs.com/news/paying-to-delete-stolen-data-doesnt-always-work-out-for-the-victim-new-study-suggests-110520.html*.



[REDACTED] [14] [REDACTED]

[REDACTED]

[REDACTED] [15] Further, the attackers [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

Crucially for purposes of this motion, Blackbaud [REDACTED]

[REDACTED] Blackbaud paid [REDACTED]

[REDACTED]

[REDACTED] [16] Blackbaud paid the ransom [REDACTED] [17] In

response to Blackbaud's [REDACTED] [18] But after

Blackbaud paid the ransom, [REDACTED]

[REDACTED] [19] Blackbaud acknowledged internally:

[REDACTED]

---

[14] *See, e.g.,* [REDACTED] Blackbaud Incident Report (attached hereto as "Exhibit K") at 32, 41.

[15] Exhibit B at 103:16-104:14, 122:11-123:14; Exhibit F at 13; Exhibit E.

[16] Exhibit B at 137:20-138:18; Hacker Communications [REDACTED] (attached hereto as "Exhibit L") at 6. [REDACTED] Exhibit B at 46:25-47:4, 143:12-144:11; Exhibit L at 1. [REDACTED] Exhibit B at 173:9-174:13, 174:18-175:14; August 10, 2020 Message Log (attached hereto as "Exhibit M") at 2.

[17] July 2, 2020 Comments [REDACTED] (attached hereto as "Exhibit N") at 1 [REDACTED]

[18] Exhibit B at 279:23-280:2; Exhibit L at 6 [REDACTED]

[19] Exhibit B at 135:6-22; 138:18; 279:23-280:2, 140:4-9, 158:12-160:6; Exhibit G at 16 [REDACTED]

5

 ████████████████████████████████[20] ████████████████████████ also agreed to help Rich Friedberg, Blackbaud's Chief Information Security Officer (or "CISO"), ███████████ ████████████████████████████████████████████, but warned Friedberg:

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████[21] And here, where the attackers are anonymous, they have no incentive to honor their agreement (because they have no reputation to defend to extract future ransom payments).

### B.     The omissions and falsehoods in the Website Notice and Notices to Social Good Entities.

Once Blackbaud became aware of the data breach, it was required by various state data breach notification laws to provide timely and accurate notice of the breach to the social good entities and class members. Timely and accurate notice is vital so that, among other things, class members can assess their risk and take measures to freeze or lock their credit profiles, avoid unauthorized charges to their credit or debit card accounts, cancel or change usernames and passwords on compromised accounts, monitor their account information and credit reports for fraudulent activity, contact their banks or other financial institutions that issue their credit or debit cards, obtain credit monitoring services, and take other steps to try to prevent identify theft. Blackbaud's notices to the public and social good entities were neither timely nor accurate. The facts uncovered in discovery so far demonstrate why.

---

[20] Exhibit J at 2 (████████████████████████████████████████████████████.
*See also* Exhibit B at 286:10-18, 288:18-289:3; Exhibit J at 1.

[21] July 18, 2020 Message Log (attached hereto as "Exhibit O"), at 2.

1.   **Blackbaud's data breach notice was designed as a public relations strategy to tout Blackbaud's supposed victory over a ransomware attacker.**

Blackbaud issued notice in July,[22] designed to lull the public into believing that the data breach was limited in scope and that Blackbaud had ensured that there was no risk to the public of their private data being published or exploited. The July notice begins with a general, self-congratulatory statement about Blackbaud's successful defenses against "millions" of other cybersecurity attacks, and then refers to the data breach in the same context:

> The Cybercrime industry represents an over trillion-dollar industry that is ever-changing and growing all the time—a threat to all companies around the world. Like many in our industry, Blackbaud encounters millions of attacks each month, and our expert Cybersecurity team successfully defends against those attacks while constantly studying the landscape to stay ahead of this sophisticated criminal industry. We wanted to notify our customers and other stakeholders about a particular security incident that recently occurred.[23]

Blackbaud then gives a "Summary of the Incident" which further paints Blackbaud as a hero "stopp[ing]" the ransomware attack and "ultimately expell[ing]" the cybercriminal from

_____

[22] ███████████████████████████████████████████████████████████

████  *See* Email Correspondence ███████████████████████ (attached hereto as "Exhibit P"); May 21, 2020 Message Log (attached hereto as "Exhibit Q"); Major Incident Alert (attached hereto as "Exhibit R"); Email Correspondence ████████████████████ (attached hereto as "Exhibit S") ████████████████████████████████████████████

[23] *Security Incident*, Blackbaud (July 19, 2020), *https://www.blackbaud.com/securityincident* [*https://web.archive.org/web/20200719170537/https://www.blackbaud.com/securityincident*] (emphasis added). Throughout this brief, Plaintiffs cite to previously-imaged versions of Blackbaud's websites. Those images are housed by independent, third parties called the Internet Archive and Perma.cc. Courts have previously taken judicial notice of web pages available through the Internet Archive's "WayBack Machine." *See, e.g.*, *Pohl v. MH Sub I, LLC*, 332 F.R.D. 713, 716 (N.D. Fla. 2019) (collecting cases); *see also* Fed. R. Evid. 201; The Bluebook: A Uniform System of Citation R.18.2.1(d) (Colum. L. Rev. Ass'n et al. eds., 21st ed. 2020) (encouraging the archiving of internet sources and using the WayBack Machine and Perma.cc as examples of "reliable" archival tools). Plaintiffs have no reason to doubt the authenticity of the WayBack Machine or Perma.cc's archives of Blackbaud's or others' websites and will obtain evidence confirming their accuracy as the case progresses.

Blackbaud's system. In the three sentences devoted to describing the impact the data breach might have on the class members, Blackbaud falsely claims that Social Security numbers and bank account information were not accessed by the hackers, and reassures the public that they received confirmation that the copy of the data the hacker extracted was destroyed before paying the ransom, and that "we have no reason to believe that any data went beyond the cybercriminal, was or will be misused; or will be disseminated or otherwise made available publicly."[24]

> Summary of Incident
>
> In May of 2020, we discovered and stopped a ransomware attack. In a ransomware attack, cybercriminals attempt to disrupt the business by locking companies out of their own data and servers. After discovering the attack, our Cyber Security team—together with independent forensics experts and law enforcement—successfully prevented the cybercriminal from blocking our system access and fully encrypting files; and ultimately expelled them from our system. Prior to our locking the cybercriminal out, the cybercriminal removed a copy of a subset of data from our self-hosted environment. **The cybercriminal did not access credit card information, bank account information, or [S]ocial [S]ecurity numbers. Because protecting our customers' data is our top priority, we paid the cybercriminal's demand with confirmation that the copy they removed had been destroyed. Based on the nature of the incident, our research, and third party (including law enforcement) investigation, we have no reason to believe that any data went beyond the cybercriminal, was or will be misused; or will be disseminated or otherwise made available publicly**. This incident did not involve solutions in our public cloud environment (Microsoft Azure, Amazon Web Services), nor did it involve the majority of our self-hosted environment. The subset of customers who were part of this incident have been notified and supplied with additional information and resources. We apologize that this happened and will continue to do our very best to supply help and support as we and our customers jointly navigate this cybercrime incident.[25]

Then, to further allay any concerns, Blackbaud reassured its customers and the public that Blackbaud had robust cybersecurity practices in place:

---

[24] *Id.*

[25] *Id.* (emphasis added).

<u>More about Blackbaud's Cybersecurity Practices and Next Steps Following this Incident</u>

Over the last five years, we have built a substantial cybersecurity practice with a dedicated team of professionals. Independent reviewers have evaluated our program and determined that it exceeds benchmarks for both the financial and technology sectors. We follow industry-standard best practices, conduct ongoing risk assessments, aggressively test the security of our solutions, and continually assess our infrastructure. We are also a member of various Cyber Security thought leadership organizations, including: The Cloud Security Alliance and Financial Services Information Sharing and Analysis Center (FS-ISAC), where we team up with other experts to share best practices and tactical threat information for the Cyber Security community. We believe the strength of our cybersecurity practice and advance planning is the reason we were able to shut down this sophisticated ransomware attack. We have already implemented changes to prevent this specific issue from happening again. You can review more details on our security, risk, compliance and privacy programs <u>here</u>.[26]

But Blackbaud's own internal documents ███████████████████████████

████████████████████████████████[27]

In addition to its misleading, publicly-facing notice, Blackbaud issued similarly-misleading notices to its customers, which customers passed along to class members. For example, Plaintiff Glasper received a notice from Allina Health informing him that the information that could have been accessed "DID NOT include: [c]redit card information, [b]ank account information, Social [S]ecurity numbers, [and] [a]ny additional medical information, such as

---

[26] *Id.*

[27] *See* PowerPoint presentation ██████████████ (attached hereto as "Exhibit GG") ██████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████

diagnosis or treatment plan."[28] Blackbaud also told the social good entities that it received assurances the cybercriminals deleted the exfiltrated data.

### 2. Blackbaud issued an updated notice that did not correct its prior deficiencies.

On September 29, 2020, despite knowing of its numerous security deficiencies, Blackbaud provided an updated notice that failed to correct any of the misstatements in the July notice. In the September update, Blackbaud removed the statement that bank account information and Social Security numbers were not accessed during the data breach, but did not explain what private information was accessed or copied, putting the onus on their customers to contact Blackbaud for information:

<u>Explanation of Involvement</u>

The majority of our customers were NOT part of this incident. This incident did not involve solutions in our public cloud environment (Microsoft Azure, Amazon Web Services), nor did it involve the majority of our self-hosted (private cloud) environment. No entire product line or private cloud datacenter was part of the incident, which means that how one customer was involved may not be the same as another. Our Blackbaud Merchant Services payment service was not part of this cyber-attack. Because the data involved varied from customer to customer, it is important that our customers speak with Blackbaud to determine their specific level

---

[28] Blackbaud's initial assurances that Social Security numbers and other sensitive data had not been accessed ultimately proved false. As late as September 14, 2020, as reflected in a letter from an attorney representing not-for-profit Lakes & Prairies Community Action Partnership, Blackbaud had provided assurances that Social Security numbers and other "sensitive text fields" on Blackbaud's Financial Edge platforms, even in back-up data, were encrypted. However, in September and October 2020, Blackbaud informed certain of its customers that, in fact, such information had been compromised—and, shockingly, this breach occurred in some instances because Blackbaud had maintained much of this sensitive private information *for decades without encryption*, making it particularly vulnerable to theft. Plaintiff Roth received a Notice from her children's former school that stated "Blackbaud indicated that certain information previously believed to have been encrypted was subsequently determined . . . to not have been encrypted, and that the compromised file may have contained your full name, Social Security number, date of birth, and address." Dec. 21, 2021 Amended Compl. ¶ 440.

of involvement, if any at all. We have contacted all involved customers to explain their circumstances and provide support.[29]

Blackbaud had ████████████████████████████████████████████

███████████████████[30] Blackbaud acknowledged in the September update that "fields" for

bank account information, Social Security numbers, and usernames and passwords were accessed,

but again downplayed the risk for misuse:

> For those customers where Blackbaud directly communicated involvement in the security incident:
>
> - The cybercriminal did not access credit cardholder data.
>
> - Further forensic investigation found that for some of the notified customers, the cybercriminal may have accessed some unencrypted fields intended for bank account information, [S]ocial [S]ecurity numbers, usernames and/or passwords. In most cases, fields intended for sensitive information were encrypted and not accessible. These new findings do not apply to all customers who were involved in the incident. **Customers who this applies to who we believe are using these fields for such information were contacted the week of September 27, 2020 and were provided with additional support.**
>
> **We sincerely apologize that this happened and will continue to partner closely with our customers as we jointly navigate this cybercrime incident.**[31]

The language in the July notice touting the millions of cyberattacks Blackbaud thwarts each month

and their purportedly substantial cybersecurity practice remained unchanged.[32] More importantly,

the September update continued to claim Blackbaud paid a ransom in exchange for confirmation

---

[29] Security Incident, Blackbaud (Sept. 29, 2020), *https://www.blackbaud.com/securityincident* (last visited January 14, 2022). Blackbaud's email notices to customers provided no better information, with one customer commenting that "the communication from Blackbaud has tended to be very long, wordy, and vague and to minimize potential problems in a way that has obscured the fact that I believe we actually were impacted." *See* Security Incident Update: No Additional Impact to Your Organization (site ID 6074) at 6 (attached hereto as "Exhibit FF").

[30] May 2020 Meeting Notes (attached hereto as "Exhibit T").

[31] Security Incident, Blackbaud (Sept. 29, 2020), *https://www.blackbaud.com/securityincident* (last visited January 14, 2022) (emphasis in original).

[32] *Id.*

that the copied data was destroyed, and that Blackbaud had "no reason to believe that any data went beyond the cybercriminal, was or will be misused; or will be disseminated or otherwise made available publicly" despite Blackbaud's knowledge that both statements were false:

> Summary of Incident
>
> In May of 2020, we discovered and stopped a ransomware attack. In a ransomware attack, cybercriminals attempt to disrupt the business by locking companies out of their own data and servers. After discovering the attack, our Cyber Security team—together with independent forensics experts and law enforcement—successfully prevented the cybercriminal from blocking our system access and fully encrypting files; and ultimately expelled them from our system. Prior to our locking the cybercriminal out, the cybercriminal removed a copy of a subset of data from our self-hosted (private cloud) environment. Because protecting our customers' data is our top priority, we paid the cybercriminal's demand with confirmation that the copy they removed had been destroyed. Based on the nature of the incident, our research, and third party (including law enforcement) investigation, we have no reason to believe that any data went beyond the cybercriminal, was or will be misused; or will be disseminated or otherwise made available publicly.[33]

These statements were issued despite the fact that the attackers ▋▋▋▋▋▋▋▋▋▋ ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋ This is despite Blackbaud's  internal admission ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋[34]

Blackbaud has not provided any additional information regarding the data breach on its website since posting the September update. Indeed, because Blackbaud continues to protest that it does not know who the data breach affected, Blackbaud implicitly admits that it has not tried to ensure that potentially implicated consumers were notified of the data breach.

---

[33] *Id.*

[34] Exhibit B at 103:16-104:14, 122:11-123:14; Exhibit F at 13; Exhibit E; Exhibit J at 2 ▋▋▋▋▋ ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋. *See also*, Exhibit B at 286:10-18, 288:18-289:3; Exhibit J at 1.

**3.     Blackbaud's ███████████████████████████████████ the data breach notices provided to its customers and the public.**

In spite of Blackbaud's representations of its robust cybersecurity policies and practices, Blackbaud █████████████████████████████████████████████

███████████████ Senior Director of Compliance and Risk Management Ryan Roberts advised

CISO Rich Friedberg ████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████[35]

Roberts presciently ████████████████████████████████

█████████████████████████████████████████████

██████[36] In fact, Blackbaud was not ████████████████████

████████████████████████████████[37]

Blackbaud ████████████████████████████████████

█████████████████████████████[38] The deficiencies in Blackbaud's

cybersecurity practices included: ████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

---

[35] Email Correspondence Regarding FAIR Assessment (attached hereto as "Exhibit U").

[36] *Id.*

[37] *Id.*

[38] Exhibit B at 213:22-214:6, 214:13-216:24, 219:4-10, 236:1-25, 246:5-247:2; November 15, 2019 Message Log (attached hereto as "Exhibit V").

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████[39]

     **4.**      **Blackbaud's "risk of harm" analysis is insufficient;** ████████████

████████████

████████████ CISO Friedberg advised that Blackbaud, ████████,[40] ████████████

█████████████████████████████████████████████████████

█████████████████████████[41] That is because, although Blackbaud stated ████████

█████████████████████████████████████████████████████

█████████████████████████[42] Blackbaud, itself, █████████████████████

█████████████████████████████████████████████████████

---

[39] Exhibit B at 215:5-23, 216:25-218:11, 226:3-228:12, 234:9-235:2, 248:5-21; Exhibit V (emphasis added).

[40]

████████████████████████ August 21, 2020 Message Log (attached hereto as "Exhibit W").

[41] July 21, 2020 Message Log (attached hereto as "Exhibit X").

[42] *Id.*

███████████[43] Indeed, Friedberg himself acknowledged ████████████

███████████████████████████████████████████████████[44]

Blackbaud ultimately ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████. This ███████████████, where Blackbaud ███████████

███████████████████████████ was based on one thing: ███████████

███████████████████████████[45]

Despite Blackbaud's assurances that further misuse or publication of the data was unlikely, a senior communications manager ████████████████████████████████

████████████████████████████████████████████████████

---

[43] *See, e.g.,* Blackbaud September 29, 2020 Notification Summaries (attached hereto as "Exhibit Y") ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████; Working List of Impact Findings (attached hereto as "Exhibit Z") ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████. Email Communications re: Blackbaud Incident - Follow Up Questions (attached hereto as "Exhibit AA"). ████████████████████████████

████████████████████████████████████████████████████

███████. September 29, 2020 Identity Monitoring Communications (attached hereto as "Exhibit BB").

[44] *Id.*

[45] *Id.* ████████████████████████████████████████████████

████████████████████████████████████



██████████████████████████████████████████[46] Blackbaud never informed the public about this finding.

Nor did Blackbaud inform the public ███████████████████████████████████████████████████████████████████████████████████████[47] Blackbaud's CISO suggested ████████████████████████████[48] Friedberg admitted in his deposition ███████████████████████████[49]

Despite seeming to adopt ███████████████████████████████████████████████████████████████. Neither Blackbaud nor ████████████████████████████████████████████. In fact, when a Blackbaud customer ██████████████████████████████████████████████████,[50] Blackbaud suggested that ███████████████████████████████████████████████████████████████████████████[51] ██████████ noted that such a request would be ███████████████████████████████████████████

---

[46] Exhibit T. *See also* Exhibit B 101:23-103:10 ██████████████████████████████████████████████████████████.

[47] Exhibit B at 276:23-277:15, 277:23-278:3; September 23, 2020 email ████████████████ ████████████████████ (attached hereto as "Exhibit CC"); September 23, 2020 email ████████████████████████████████ (attached hereto as "Exhibit DD").

[48] Exhibit DD.

[49] Exhibit B at 283:15-23.

[50] *Id.*

[51] *Id.*

█████████████████████████████████████████████████████████████████████████ [52]

Accordingly, ████████████████████████████████████████████████

████████████████████████████████████████████████████ [53] ████████

████████████████████████████████████████████████████████████████

████ [54]

## II.    Argument

### A.    Legal Standard

"Courts are vested with certain inherent powers necessary 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Romano v. SLS Residential Inc.*, 253 F.R.D. 292, 297 (S.D.N.Y. 2008) (citation omitted). "These powers must be exercised with discretion." *Id.* "'A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process.'" *Id.* (citation omitted).

"Separate and apart from the various sources of sanctions authority, the Court must safeguard the interests of absent class members." *O'Connor v. Uber Techs., Inc.*, No. 13-cv-03826-EMC, 2017 WL 3782101, at *5 (N.D. Cal. Aug. 31, 2017) (citing *Allen v. Bedolla*, 787 F.3d 1218 (9th Cir. 2015)). The *O'Connor* court further explained that Rule 23(d) provides:

---

[52] *Id.*

[53] *Id.*

[54] *See* August 20, 2020 Message Log (attached hereto as "Exhibit EE"). ██████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

> In conducting an action under this rule, the court may issue orders that ... (B) require—to protect class members and fairly conduct the action—giving appropriate notice to some or all class members of: (i) any step in the action; (ii) the proposed extent of the judgment; or (iii) the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action.

Fed. R. Civ. P. 23(d)(1)(B)(i)-(iii). This has been described as a "nonexhaustive list." *See* Newberg on Class Actions, § 8:26; *see also* Fed. Prac. & Proc. § 1793 (enumerated factors are "not intended ... to represent an exhaustive list of possible occasions on which orders requiring that notice be given to the class might be utilized"). The purpose of Rule 23(d) is to permit discretionary notice "when needed for the protection of class members or for the fair conduct of the action." Manual for Complex Litigation § 21.31 (4th ed.).

*Id.*

### B.     Corrective Notice is Necessary

#### 1.     Blackbaud's Notice Was Inaccurate and Misleading

"A court may 'take action to cure the miscommunication and to prevent similar problems in the future' where 'potential class members have received inaccurate, confusing or misleading communications.'" *Cheverez v. Plains All Am. Pipeline, L.P.*, No. CV15–4113 PSG (JEMx), 2016 WL 861107, at *2 (C.D. Cal. Mar. 3, 2016) (citation omitted).

There is no doubt that consumers and Blackbaud's customers have received inaccurate, confusing and misleading communications from Blackbaud. Below are several examples of misleading statements and why Plaintiffs now know them to be wrong.



This is an incredible misstatement. Blackbaud ███████████████████████████████████████████████[55] Blackbaud's own documents reveal ██████████

---

[55] Exhibit N at 1 █████████████████████████████████████.

██████████████████████████████████████████████████████████

████ ; but Blackbaud made the false statement anyway.[56] Of course, telling the public that

Blackbaud ██████████████████████████████████████

██████████████████████████████████████████████████

███████████████████ . This lie significantly understates the degree of class members' risk,

and without risk, class members would have no reason to freeze their accounts, obtain credit

monitoring, or otherwise protect themselves.

- **Blackbaud has falsely claimed that it has "no reason to believe that any data went beyond the cybercriminal, was or will be misused; or will be disseminated or otherwise made available publicly."**

Blackbaud has ████████████████████████████████████

█████████████████████████████████████[57] Blackbaud asked ████████

█████████████████████████████████████████████████[58] To

suggest that consumers have no risk that their information would surface on the dark web is

dangerous and reckless—especially when Blackbaud's ████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████ . The fact that Blackbaud evidently

██████████████████████████████████████████████████

████████████████████████████████ .

---

[56] Exhibit J at 2.

[57] Exhibit DD.

[58] Exhibit B at 276:23-277:15, 277:23-278:3; Exhibit CC; Exhibit DD.

- **Blackbaud's notice falsely claimed that Blackbaud "discovered and stopped a ransomware attack" in May of 2020.**

Far from discovering and stopping a ransomware attack, ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████. Blackbaud's

communication to the public began with, "Learn more about the Ransomware attack we recently

stopped," designed to downplay any concern about the breach or the risk of harm associated with

the breach.   In fact, because Blackbaud ████████████████████████████

████████████████████████████████████████████████

███████████████████████ Consumers are very much at risk of identity theft and fraud.

- **Blackbaud told class members it follows "industry-standard best practices."**

Blackbaud's Chief Information Security Officer admitted ██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████[59] Blackbaud's ████████████████████

███████████████████████ would be material to consumers in determining what steps

should be taken to limit the risk of misuse of their data (and, indeed, whether they should continue

renewing memberships or making donations online to Blackbaud's customers).

---

[59] Exhibit B at 215:5-23, 216:25-218:11, 226:3-228:12, 234:9-235:2, 248:5-21; Exhibit V (emphasis added).

In short, there are few, if any, accurate statements made to class members about the data breach, and the information class members have received suggests that their risk of identity theft, fraud, or data misuse is much lower than it actually is.

### C.      The Court has broad authority to order corrective notice.

First, there is no question that this Court has the authority to permit corrective notice to be issued. Indeed, "the district court has a fiduciary duty to look after the interests of . . . absent class members." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015). Because Blackbaud's miscommunication presents "opportunities for abuse" the Court has "both the duty and the broad authority" to supervise communication between the parties and potential class members. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99-100 (1981). This duty is present before a class is certified. *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on Apr. 20, 2010*, No. 10-md-02179, 2011 WL 323866, at *2. (E.D. La. Feb. 2, 2011); *Keystone Tobacco Co., Inc v. U.S. Tobacco Co.,* 238 F. Supp. 2d 151, 154 (D.D.C. 2002) ("[T]he Court rejects defendants' position that it has no authority to limit communications between litigants and putative class members prior to class certification."); *Ralph Oldsmobile Inc. v. Gen. Motors Corp.,* No. 99 Civ. 4567(AGS), 2001 WL 1035132, at *2 (S.D.N.Y. Sept. 7, 2001) ("[A] court's power to restrict communications between parties and potential class members [ ] appl[ies] even before a class is certified.").

Second, corrective notice is appropriate because class members have received inaccurate information, both directly from Blackbaud and vis-à-vis Blackbaud's customers, who supplied class members with notices based on the inaccurate information they received from Blackbaud. As explained above, Blackbaud made numerous inaccurate statements that lulled class members into a false sense of security. The presence of materially misleading information justifies corrective notice. In other cases, where defendants have provided class members with misleading information that steered class members to unknowingly waive their rights and enter into releases, courts have

required corrective notice. *See, e.g.*, *Marino v. CACafe, Inc.*, No. 16-CV-6291 YGR, 2017 WL 1540717, at *2 (N.D. Cal. Apr. 28, 2017) (granting request for plaintiffs' counsel to mail curative notice and prohibiting defendants from engaging in any *ex parte* communications with putative class members); *Slavkov v. Fast Water Heater Partners I, LP*, No. 14-CV-04324-JST, 2015 WL 6674575, at *2 (N.D. Cal. Nov. 2, 2015) (granting request to send a curative notice). So, too, here, corrective notice is warranted because Blackbaud designed its notices to be misleading and provide inaccurate and false information, which could lead class members not to protect themselves, not take actions to mitigate their losses, or refuse credit monitoring if offered by one of Blackbaud's customers on the basis that the data breach prevented little risk to consumers.

Third, corrective notice is appropriate because of the magnitude of the harm class members face. "Communications which are misleading 'pose a serious threat to the fairness of the litigation process, the adequacy of representation, and the administration of justice generally." *Cheverez*, 2016 WL 861107 at *2, 5 (ordering corrective notice under Rule 23(d) where "Defendants' advertisements [were] part of a misleading campaign to steer putative class members towards unknowingly waiving their rights"). If class members are unaware of the risk they face, they may not take measures to freeze or lock their credit profiles, avoid unauthorized charges to their credit or debit card accounts, cancel or change usernames and passwords on compromised accounts, monitor their account information and credit reports for fraudulent activity, contact their banks or other financial institutions that issue their credit or debit cards, obtain credit monitoring services, and take other steps to try to prevent identify theft. This risk is particularly acute where, as here, class members do not have individual counsel who can advise them of the risk of fraud. *In re Oil Spill*, 2011 WL 323866, at *7.

22

More specifically, government entities and other sources have recently published articles and instructions with regard to the current rise in fraud, including the problems individuals may face from not having adequate information from a data breach notice and the failure to take adequate precautions. In October 2021, the Identity Theft Resource Center highlighted how "[t]he number of ransomware-related data compromises reported so far in 2021 *exceed* the number of similar events in 2020 & 2019 *combined*. [60] It should be noted that the 1,111 cyberattack-related data events reported so far this year is more than *all data compromises in full-year 2020*."[61] It further explained that inadequate notices—like Blackbaud's, here—prevent victims of data breaches from taking adequate measures to protect themselves:

> When they are reported, the notices are largely meaningless with little transparency or actionable information. A recent study by the University of Michigan and a second by Carnegie Melon University both show that we simply are not equipping victims with enough information about what happened and how to protect themselves.[62]

Finally, corrective notice is appropriate because Plaintiffs propose that the notice be issued by Co-Lead Counsel and the Plaintiffs' Steering Committee, at Plaintiffs' expense. There is no

---

[60] Testimony of the Identity Theft Resource Center before the U.S. Senate Committee on Commerce, Science, and Technology (Oct. 6, 2021), *available at* *https://www.idtheftcenter.org/wp-content/uploads/2021/10/Identity-Theft-Resource-Center-ITRC-Senate-Commerce-Enhancing-Data-Security-Written-Remarks.pdf*; *see also* Chris Morris, The number of data breaches in 2021 has already surpassed last year's total, Fortune (Oct. 5, 2021), *https://fortune.com/2021/10/06/data-breach-2021-2020-total-hacks/* (quoting the ITRC that there has been an increase in a lack of transparency in breach notices both at the organization and government level that if it continues could lead to a significant impact on individuals.); Total Identity Fraud Losses Soar to $56 Billion in 2020, BusinessWire (Mar. 23, 2021), *https://www.businesswire.com/news/home/20210323005370/en/Total-Identity-Fraud-Losses-Soar-to-56-Billion-in-2020*.

[61] *Id.*

[62] Testimony of the Identity Theft Resource Center, *supra* n.60 at 8.

23

prohibition on Plaintiffs' counsel communicating with class members.[63] Plaintiffs have filed this Motion in an abundance of caution to ensure that the content of the communication is acceptable to the Court. Plaintiffs' efforts to contact class members with corrective notice are also in line with their duties to adequately represent the class pursuant to Rule 23(a)(4), and class counsel's fiduciary duties to the class.

## D.     The proposed form and manner of notice is appropriate.

The proposed notice is a narrowly drawn remedy in response to Blackbaud's misleading communications. *Marino v. CACafe, Inc.*, No. 16-CV-6291 YGR, 2017 WL 1540717, at \*2 (N.D. Cal. Apr. 28, 2017) (granting request for plaintiffs' counsel to mail curative notice and prohibiting defendants from engaging in any *ex parte* communications with putative class members). The notice is clear, informative, and easy to understand.

Additionally, Co-Lead counsel and the Plaintiffs' Steering Committee will bear the cost of the notice and undertake the act of disseminating the notice to minimize any potential objections by Blackbaud. To effectuate the notice, Plaintiffs request the Court to issue an order requiring Blackbaud to provide the e-mail addresses of the customers whose clients' information was exfiltrated in the data breach. Plaintiffs will also publish notice with the assistance of a qualified claims administrator. While the notice need not comply with Rule 23, as the class is not yet

---

[63] The ability to communicate with members of the class is acutely important given the fiduciary duties that class counsel owes unnamed class members. 6 Newberg on Class Actions § 19:2 (5th ed.) ("Plaintiffs' counsel may wish to advise potential plaintiffs of their rights and encourage their involvement in a class suit, to seek helpful evidence from absent class members, or simply to keep absent class members more informed of the status of the litigation than the formal notices require"); *see also Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1079 (9th Cir. 2017) (acknowledging fiduciary obligations owed to absent class members before certification); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995).

certified, plaintiffs will undertake efforts to ensure that a high percentage of the class is exposed to the notice.

## III.     Conclusion

The Court has supervisory authority over communications with absent class members. In light of the egregiousness of Blackbaud's misstatements and the risk of harm faced by class members if they are not corrected, Plaintiffs respectfully request the Court's permission to send corrective notice.

Dated this 3rd day of February 2022          Respectfully submitted,


/s/ Marlon E. Kimpson
Marlon E. Kimpson (SC Bar No. 17042)
**MOTLEY RICE LLC**
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Tel.: (843) 216-9000
Fax: (843) 216-9027
Email: mkimpson@motleyrice.com

Amy E. Keller
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Tel: (312) 214-7900
Fax: (312) 253-1443
Email: akeller@dicellolevitt.com

Krysta Kauble Pachman
**SUSMAN GODFREY LLP**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
Email: kpachman@susmangodfrey.com

Harper Segui
**WHITFIELD BRYSON LLP**
Federal ID No. 10841
217 Lucas Street, Suite G

25

Mount Pleasant, SC 29464
Tel: (919) 600-5000
Fax: (919) 600-5035
Email: harper@whitfieldbryson.com

*Plaintiffs' Co-Lead Counsel*

Gretchen Freeman Cappio
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: (206) 623-1900
Fax: (206) 623-3384
Email: gcappio@kellerrohrback.com

*Chair of Plaintiffs' Steering Committee*

Desiree Cummings
**ROBBINS GELLER RUDMAN & DOWD LLP**
420 Lexington Avenue, Suite 1832
New York, NY 10170
Tel: (212) 693-1058
Email: dcummings@rgrdlaw.com

Melissa Emert
**KANTROWITZ, GOLDHAMMER & GRAIFMAN, PC**
747 Chestnut Ridge Road
Chestnut Ridge, NY 10977
Tel: (866) 574-4682
Fax: (845) 356-4335
Email: memert@kgglaw.com

Kelly Iverson
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: (412) 322-9243
Fax: (412) 231-0246
Email: kelly@lcllp.com

Howard Longman
**LONGMAN LAW, P.C.**
354 Eisenhower Parkway, Suite 1800
Livingston, NJ 07039
Tel: (973) 994-2315

26

Fax: (973) 994-2319
Email: hlongman@longmanlaw.com

Douglas McNamara
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Avenue NW
East Tower, 5th Floor
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
Email: dmcnamara@cohenmilstein.com

Melissa Weiner
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Tel: (612) 389-0600
Fax: (612) 389-0610
Email: mweiner@pswlaw.com

*Plaintiffs' Steering Committee*

Frank Ulmer
**MCCULLEY MCCLUER LLC**
701 East Bay Street, Suite 411
Charleston, SC 29403
Tel: (843) 444-5404
Fax: (843) 444-5408
Email: fulmer@mcculleymccluer.com

*Plaintiffs' Liaison Counsel*

27