**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

|  |  |
|---|---|
| ) | Case No.: 3:20-mn-02972-JFA |
| ) |  |
| IN RE: BLACKBAUD, INC., ) | MDL No. 2972 |
| CUSTOMER DATA BREACH ) |  |
| LITIGATION ) | **MEMORANDUM OPINION** |
| ) | **AND ORDER** |
| ) |  |
| _____ ) |  |

This matter is currently before the Court on Plaintiffs' Motion for Leave to File a Renewed Class Certification Motion. (ECF No. 508). The Motion has been fully briefed and the Court heard oral argument from the parties on December 17, 2024. The Motion is therefore ripe for review.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Blackbaud is a publicly traded Software-as-a-Service company incorporated in Delaware and headquartered in Charleston, South Carolina. (ECF No. 195 ¶ 331). The company provides data collection services to a wide variety of "social good entities" including arts and cultural organizations, faith communities, foundations, healthcare organizations, higher education institutions, individual change agents, K-12 schools, and nonprofit organizations. These entities make up Blackbaud's customers, and Defendant serves them by collecting and storing the Personally Identifiable Information ("PII") and Protected Health Information ("PHI") belonging to these customers' donors, patients, students, and congregants, which this Court will refer to as "constituents." The constituents, rather than Blackbaud's customers, are the plaintiffs in this case.

Plaintiffs represent a putative class of constituents whose assert that their PII and PHI were compromised from February 7, 2020 to May 20, 2020, when cybercriminals orchestrated a two-part ransomware attack on Blackbaud's systems. Following the initial breach, Blackbaud gave notice to its customers whose constituents' data may have been involved in the attack. (ECF No.

496 at 94–97). Many of Blackbaud's customers then provided notices to their constituents. Important to the present Motion, California law specifically requires businesses to send notice letters containing specific information when certain elements are met. *See* Cal. Civ. Code § 1798.82(a) (effective Jan. 1, 2020 to Dec. 31, 2020).[1]

After the breach was made public, lawsuits were filed in state and federal courts across the United States before eventually being consolidated into the instant multidistrict ligation ("MDL") case before this Court. The Initial Transfer Order placing the MDL in the District of South Carolina was entered on December 15, 2020 (ECF No. 1), and the Consolidated Amended Class Action Complaint containing all claims that survived Defendant's motions to dismiss was filed on February 3, 2022 (ECF No. 195). The parties engaged in extensive discovery, which ended on November 30, 2022. (ECF No. 280 at 1).

Plaintiffs' initial Motion for Class Certification was filed on December 16, 2022 (ECF No. 293). Blackbaud filed its Response in Opposition on June 8, 2023 (ECF No. 329), and Plaintiffs submitted their Reply on October 20, 2023 (ECF No. 414). After briefing on the Motion concluded, the Court held a three-day hearing from March 6–8, 2024. The Court issued its Order Denying Plaintiffs' Motion for Class Certification on May 14, 2024 (ECF No. 497). In its Order, the Court held that Plaintiffs failed to meet their burden of proof as to ascertainability because their proposed methods were flawed and would require the Court to engage in significant individualized fact-finding rendering them administratively unfeasible.

On May 28, 2024, Plaintiffs petitioned the United States Fourth Circuit Court of Appeals for permission to appeal the Court's Order Denying Plaintiffs' Motion for Class Certification. On

---

[1] The statutory citations herein refer to the versions in effect during the data breach, although the Court notes that the subsequent amendments would not impact its analysis.

July 30, 2024, Plaintiffs' request was denied. On September 3, 2024, the Court held a Case Management Conference and subsequently provided a briefing schedule for Plaintiffs' Motion for Leave to File a Renewed Motion for Class Certification. (ECF No. 505). Pursuant to the Court's Order, Plaintiffs filed their Motion for Leave (ECF No. 508) on September 27, 2024, Defendant filed its Reply in Opposition (ECF No. 520) on October 24, 2024, and Plaintiffs filed their Reply in Support (ECF No. 525) on November 8, 2024. The hearing on this Motion was held on December 17, 2024.

As set forth in their Motion, Plaintiffs seek leave to file a renewed motion for certification of a proposed subclass made up of:

> All natural persons residing in California who received a notice letter from a Blackbaud customer stating that their first name or first initial and last name in combination with any one of their (i) social security number, (ii) driver's license number, (iii) California identification card number, (iv) tax identification number, (v) passport number, (vi) military identification number, (vii) bank account number, (viii) debit card number, (ix) credit card number, (x) health insurance policy number, or (xi) health insurance subscriber identification number, was exposed, exfiltrated, taken, stolen, accessed, acquired, copied, impacted, and/or contained in the backup file involved in Blackbaud, Inc.'s data security breach between February 7, 2020 and May 20, 2020.

(ECF No. 508 at 16). According to Plaintiffs, the Proposed Renewed Motion for certification of the subclass above, narrowing class claims to those brought under the California Consumer Protection Act ("CCPA") cures the ascertainability issues previously identified. Specifically, Plaintiffs contend that ascertainability is met for the proposed subclass ("CCPA Subclass") because membership is based solely on notice letters that Blackbaud customers sent their constituents as required by California law—not on the contents of Blackbaud's databases or Blackbaud's post breach investigation, which were central to the Court's previous ascertainability determination. (*Id.* at 14). Plaintiffs aver that the CCPA Subclass presents "a straightforward and efficient" method of litigating the bellwether claims consistent with the Court's prior rulings. (*Id.* at 7). Defendant

opposes Plaintiffs' Motion for Leave, arguing that no justification exists for filing a renewed motion and that the additional discovery required to investigate the proposed class would impose a significant burden on Blackbaud and disrupt the schedule of the case. (ECF No. 520 at 22). Blackbaud also maintains that, even if the Motion was appropriate, it would be futile because the proposed subclass is not ascertainable, individual issues predominate, Plaintiffs' proposed method is inferior, and Plaintiffs' injunctive relief argument fails.

## II.     STANDARD OF REVIEW

As an initial matter, the parties dispute the appropriate standard applicable to Plaintiffs' Motion for Leave. Plaintiffs primarily rely on the Court's "broad discretion" under Federal Rule of Civil Procedure 23 to justify their request for leave to file a renewed class certification motion. (ECF No. 508 at 12). Plaintiffs insist that it is common practice for courts in the Fourth Circuit and across the country to consider renewed motions for class certification to remedy defects in an earlier class certification proposal. (*Id.*). In support of this position, Plaintiffs cite to cases in and outside of the Fourth Circuit where courts have granted renewed class certification motions, primarily relying on a case from the Third Circuit.[2] Blackbaud, on the other hand, urges the Court to apply an "exacting standard" based on the law of the case doctrine. (ECF No. 520 at 18). Although the Court finds the appropriate standard in between those espoused by the parties, application of a different standard would not impact the Court's decision.

---

[2] In *Hargrove v. Sleepy's LLC*, cited by Plaintiffs, the Third Circuit held that the district court below should not have treated a renewed motion for class certification as a motion for reconsideration, but should have afforded it the same treatment as an initial Rule 23 motion. 974 F.3d 467 (3d Cir. 2020). As discussed below, the motion for reconsideration standard may be too high here, but Fourth Circuit district courts still require some basis to justify further argument on class certification.

Rule 23(c)(1)(C) grants district courts discretion to alter or amend an order regarding class certification at any time before final judgment. The court's discretion to reconsider class certification, however, cuts both ways. *See G.T. v. Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 209 n.12 (4th Cir. 2024) ("[d]istrict courts have ample discretion to consider (or to decline to consider) a revised class certification motion after an initial denial") (quoting *In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 72–73 (2d Cir. 2007)). Plaintiffs are correct that courts often exercise their discretion to consider renewed class certification motions. However, Plaintiffs' argument glosses over the distinct procedural positions of the cases they cite, where courts considered renewed motions on remand from the 4th Circuit,[3] where the prior motion was not considered or was denied without prejudice,[4] or where the defendant engaged in misconduct.[5]

On the whole, district courts in the Fourth Circuit "generally require some basis to justify further argument as to class certification, such as new evidence or materially changed or clarified circumstances." *Fitzwater v. Consol Energy, Inc.*, No. 1:19-cv-331, 2020 WL 3620078, at *3 (S.D. W. Va. July 2, 2020) (quotations omitted). This approach is supported by the Advisory Committee Notes on Rule 23(c) which state that "[a] determination once made can be altered or amended before the decision on the merits if, upon fuller development of the facts, the original determination appears unsound." Courts also consider whether allowing protracted argument on class

---

[3] *In re Zetie (Ezetimibe) Antitrust Litig.*, No. 2:18-md-2836, 2022 WL 1577219 (E.D. Va. Jan. 25, 2022) (considering renewed motion upon remand from Fourth Circuit); *Adair v. EQT Prod. Co.*, 320 F.R.D. 379, 388 (W.D. Va. 2017) (same).

[4] *Brown v. Lexington Cnty.*, No. 3:17-1426-MBS, 2021 WL 856878, at *2 (D.S.C. March 5, 2021) (prior motion denied without prejudice before the parties engaged in discovery); *Gardner v. Country Club, Inc.*, No. 4:13-CV-03399-BHH, 2015 WL 7783556, at *1 (D.S.C. Dec. 3, 2015) (declining to rule on initial motion for class certification until after defendant filed motion to dismiss); *Degidio v. Crazy Horse Saloon & Rest., Inc*, No. 4:13-CV-02136-BHH, 2015 WL 5834280, at *6 (D.S.C. Sept. 30, 2015) (same).

[5] *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 54 (E.D. Va. 2021) (granting renewed motion where defendant made material misrepresentations to the court).

certification would cause prejudice to the nonmoving party or interfere with judicial economy and efficient case resolution. In *Garcia v. Volkswagen Group of America, Inc.*, for example, the plaintiffs filed a motion to modify the scheduling order to allow for additional argument on class certification. No. 1:19-cv-331, 2022 WL 18034353 (E.D. Va. March 23, 2022). Accordingly, the court conducted its analysis under both Rule 23 and Rule 16, explaining that "inquiry into propriety of allowing a second chance at class certification is intertwined with the concerns of adherence to the scheduling order." *Id.* at *2. Ultimately, the court concluded that the plaintiffs had not presented a sufficient rationale to allow a second attempt at class certification. *Id.* at *3. Specifically, the plaintiffs failed to present any new evidence or clarification of circumstances to justify granting a motion that would severely prejudice the defendant and interfere with judicial economy. *Id.*

In *Sustainable Forest, LLC v. Qwest Communications International, Inc.*, No. 0:01-2935-CMC, 2006 WL 8422988 (D.S.C. Feb. 23, 2006), the district court began its analysis of the plaintiffs' request to file a new motion for class certification by considering the procedural history of the case and the resources that had already been expended. The court found that allowing the plaintiffs to propose a new narrower class would require significant additional time by the court and opposing counsel to examine an argument that could have been made in the alternative in the plaintiffs' prior motion. *Id.* at *3. Importantly, the court emphasized that allowing a "follow on" motion for class certification could encourage plaintiffs seeking class certification to propose only their preferred class in their initial motion, converting the first motion into something of an "opening bid." *Id.* The court reasoned that allowing such a piecemeal approach is contrary to interests of judicial economy and should be discouraged. *Id.*

The Court also remains cognizant that MDLs were created by Congress to encourage efficiency. Therefore, "MDL courts must be able to establish schedules with firm cutoff dates if

the coordinated cases are to move in a diligent fashion toward resolution by motion, settlement, or trial." *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 2:21-CV-2413-RMG, 2022 WL 678993, at *1 (D.S.C. Jan. 21, 2022) (quoting *In re Guidant Corp. Implantable Defibrillators Prod Liab. Litig.*, 496 F.3d 863, 867 (8th Cir. 2007)). Therefore, the transferee court has "greater discretion to organize, coordinate and adjudicate its proceedings[.]" *Id.* Ultimately, in exercising discretion over the present motion, the Court weighs Plaintiffs' proffered basis for requesting additional argument on class certification against the interests of judicial economy and potential prejudice to Blackbaud.

### III.     ANALYSIS

**A.     Plaintiffs' Proposed Rule 23(b)(3) CCPA Subclass**

**1.     Clarification of Ascertainable Rule 23(b)(3) Damages Class**

Plaintiffs initially argue that the Court should exercise its discretion to allow additional argument on class certification because they are merely refining a previously advanced theory of liability to fix the deficiencies central to the Court's ascertainability determination. (ECF No. 508 at 14). In their Reply, Plaintiffs pivot to focus on the "clarified circumstances," emphasizing that the proposed CCPA Subclass narrows the class size from hundreds of millions to "at most, tens or hundreds of thousands." (ECF No. 525 at 10).

Plaintiffs aver that members of their newly proposed CCPA Subclass are readily identifiable in reference to objective criteria set forth in the relevant notice letters from Blackbaud customers. According to Plaintiffs, membership in the proposed CCPA Subclass turns on whether (1) the subclass member is a California resident; (2) the subclass member received a notice letter from a Blackbaud customer; and (3) the notice letter communicates that the subclass member's qualifying personal information was compromised in the Blackbaud data breach. (ECF No. 508 at

16). As such, Plaintiffs reason that "the satisfaction of every single criterion is readily determined based on review of the notice letters that Blackbaud's customers sent to their California resident constituents, and the notice letters alone." (*Id.*). Plaintiffs clarified at the December 17, 2024 hearing that their proposed CCPA Subclass is limited to the constituents of nine Blackbaud customers whose notices they claim contain the qualifying language.[6]

Blackbaud does not appear to contest the objective nature of these criteria. Instead, Blackbaud responds that regardless of the class definition, Plaintiffs must still identify the data elements stored for each individual constituent to even begin to ascertain CCPA Subclass members. (ECF No. 520 at 11). Blackbaud asserts Plaintiffs' new ascertainability arguments fail for the same reason as their previous theory—the need for individualized review and comparison. (*Id.*).

Plaintiffs set forth two potential methods of identifying individuals who received notice letters from Blackbaud's customers: (1) a targeted publication notice campaign; and/or (2) targeted discovery of a "known set" of Blackbaud customers to obtain copies of individual notice letters sent or data reports of constituents who received such letters. (ECF No. 508 at 21–22). Plaintiffs' first suggested method of identifying class members is a targeted notice campaign. The proposed notice campaign would include a digital notice effort targeting adults in California, a case website where putative class members could learn about the case, and a toll-free number and post office box putative members could use to inquire about the action. (ECF No. 508-13 at 5–6). However, Plaintiffs would still have to verify class membership based on a review of each putative class member's notice letter, assuming the individual still has the letter. *See, e.g.*, *Marcus v. BMW of N.*

---

[6] The customers are The Center for Early Education, Crystal Stairs, Florida State College at Jacksonville Foundation, Fort Hays University Foundation, Georgia Southern University, International Medical Corps., Oakwood School, San Francisco University High School, and The Seven Hills School. (ECF No. 525 at 9 n.1).

*Am., LLC*, 687 F.3d 583, 594 (3d Cir. 2012) ("Forcing BMW and Bridgestone to accept as true absent persons' declarations that they are members of the class, without further indicia of reliability, would have serious due process implications."). And Plaintiffs maintain that the number of CCPA Subclass members could be around one hundred thousand, necessitating a manual review of tens of thousands of letters after a protracted notice campaign.

Plaintiffs' second method of ascertaining class members is to conduct "targeted discovery" of a "known set" of Blackbaud customers to obtain copies of individual notice letters sent or data reports of constituents who received such notice letters. (ECF No. 508 at 22). While theoretically possible, the feasibility of this method lacks any evidentiary support. Discovery has been closed for two years, and neither party requested documents from the relevant customers, rendering the existence of such records hypothetical. Assuming such records exist, and these third parties willingly engage in discovery, the format of the records is unknown. If the relevant records are not stored in a readily searchable electronic format, individual review of an undetermined number of records could be required. Consequently, even if the relevant records exist, Plaintiffs cannot establish ascertainability simply by asserting that class members can be identified using the records. They must also "establish that the records are in fact useful for identification purposes, and that identification will be administratively feasible." *Piotrowski v. Wells Fargo*, No. DKC-11-3758, 2015 WL 4602591, at *18 (D. Md. July 29, 2015) (quoting *Karhu v. Vital Pharms., Inc.*, 621 F. App'x 945, 948 (11th Cir. 2015)); *see also Spotswood v. Hertz Corp.*, No. RDB-16-1200, 2019 WL 498822, at *6 (D. Md. Feb. 7, 2019) (plaintiffs "cannot merely identify a mass of data which could aid the process of identifying class members[,]" they "must also provide an efficient method of using this information."). The records Plaintiffs propose to use are at this point hypothetical, rendering determination of their usefulness illusory. *See In re Marriott Int'l, Inc., Customer Data*

*Sec. Breach Litig.*, 341 F.R.D. 128, 144 n.14 (D. Md. 2022) (noting that the defendant actually possessed the data, "distinguishing it from cases where ascertainability was complicated by data being hypothetical or held by third parties who had not yet agreed to cooperate").

According to Plaintiffs, the relevant inquiry at this stage is whether Plaintiffs have cured the deficiencies identified in the Court's Order Denying Plaintiffs' Motion for Class Certification by redefining the CCPA Subclass so that members are readily identifiable in reference to objective criteria. (ECF No. 525 at 14). Plaintiffs contend their renewed motion does just that, arguing that the proposed CCPA Subclass reduces the number of class members to the tens or hundreds of thousands at most. (*Id.*). However, Plaintiffs do not cite to any evidence to support their approximation of the size of the newly proposed class. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 360 (4th Cir. 2014) ("Lacking even a rough outline of the classes' size and composition, we cannot conclude that they are sufficiently ascertainable.").

Overall, Plaintiffs have not shown their proposed methods of identifying class members are administratively feasible. Therefore, Plaintiffs have not shown a clarification of circumstances to cure the deficiencies identified previously. Moreover, the issues underlying Plaintiffs' reliance on the customer notices for newly proposed CCPA Subclass permeate Rule 23(b)'s requirements as set forth below.

### 2.    Predominance

Certification under Rule 23(b)(3) requires that common questions of law or fact predominate over any questions affecting only individual class members. "The predominance requirement is similar to but 'more stringent' than the commonality requirement of Rule 23(a)." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (citing *Lienhart v. Dryvit Sys.*, 255 F.3d 138, 146 n.4 (4th Cir. 2001)). "The predominance inquiry focuses not only on the

existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation." *EQT Prod. Co.*, 764 F.3d at 366. "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 W. Rubenstein, *Newberg on Class Actions* § 4:50 (5th ed. 2012)). Determining whether questions of law or fact common to class members predominate begins with the elements of the underlying cause of action. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

The CCPA provides a private right of action for actual or statutory damages to "[a]ny consumer whose nonencrypted and nonredacted personal information . . . is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information[.]" Cal. Civ. Code § 1798.150(a) (effective Jan. 1, 2020 to Dec. 31, 2022). Common questions for the CCPA Subclass would therefore include whether Blackbaud qualifies as a business under the CCPA and whether Blackbaud violated its duty to implement and maintain reasonable security procedures and practices. Nonetheless, numerous individual questions would also need to be answered for this class. Such inquiries include the consumer status of each potential class member (including state of residency at the time of the breach), whether the individual's personal information was subject to the breach, whether the information was unredacted and unencrypted, and whether Blackbaud's conduct caused their information to be subject to the breach. In determining whether individual or common questions predominate, the Court examines each of the common and individualized

questions presented "to weigh the quality and complexity of each issue" as it relates to the claims. *Soutter v. Equifax Info. Svcs., LLC*, 307 F.R.D. 183, 214 (E.D. Va. 2015).

### i. Common Questions

Blackbaud represents that the CCPA "codifies a negligence standard that explicitly must be assessed in the context of the nature of the data stored." (ECF No. 520 at 36). Consequently, litigating whether Blackbaud's data security procedures were reasonable will require assessment of: "(1) the nature of the specific data stored by any one of Blackbaud's many customers across diverse industries and how Blackbaud's security measures compared to the industry standards for that type of data, customer and use; and (2) whether the data at issue was potentially accessed and exfiltrated due to the customer's choice to store that data in an unencrypted and unintended field." (*Id.* at 36–37). Plaintiffs' counter that Blackbaud's negligence is not at issue. (ECF No. 525 at 18). Instead, Plaintiffs maintain that "the inquiry is whether Blackbaud violated its statutory 'duty to implement and maintain reasonable security procedures and practices appropriate' to protect the highly sensitive personal information stolen in the data breach." (*Id.* (quoting Cal. Civ. Code. § 1798.150(a)(1)).). The Court agrees with Plaintiffs that the relevant inquiry on this issue will focus on Blackbaud's conduct. Indeed, Blackbaud's defenses "must be factored into the calculus of whether common issues predominate[,]" *Gunnells v. Healthplan Svcs., Inc.*, 348 F.3d 417, 438 (4th Cir. 2003), and the defenses will raise some individual questions regarding the practices of Blackbaud's customers. However, such questions do not predominate over common questions related to Blackbaud's conduct.

Blackbaud also suggests that assessing statutory damages under the CCPA would be highly individualized. Specifically, Blackbaud espouses a catalogue of considerations that would impact whether a consumer has been "harmed" by Blackbaud's conduct, including whether the

individual's stored PII was inaccurate, stale, or obsolete; whether a plaintiff had previously voluntarily published the PII at issue; whether the plaintiff had the PII exposed in other, unrelated prior breaches; and the nature of the individual's own data security practices. (ECF No. 520 at 37–38). Plaintiffs respond that the CCPA expressly addresses the relevant circumstances for assessing statutory damages—all which concern the defendant, not the individual plaintiffs. (ECF No. 525 at 20). In the Proposed Renewed Motion for Class Certification, Plaintiffs suggest that determining subclass damages only requires multiplying the number of data breach "incidents" by the statutory damages assessed. (ECF No. 514 at 40–41). At the motions hearing, Plaintiffs clarified that damages would be assessed based on Blackbaud's conduct and assets, providing a standard amount to each class member.

The Court agrees with Plaintiffs that the common questions regarding Blackbaud's alleged misconduct likely predominate over individual questions related to statutory damages. The CCPA provides that, in assessing the amount of statutory damages, "the court shall consider any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to, the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth." Cal. Civ. Code § 1798.150(a)(2).[7] Although the considerations listed in the statute are not exclusive, the qualitatively overarching issue in determining statutory damages will be Blackbaud's policies, practices, and conduct.

---

[7] *See People ex rel. Harris v. Sarpas*, 225 Cal. App. 4th 1539, 1567 (2014) (rejecting argument that "individualized proof of each and every" violation is required to assess civil penalties under California statutes with similar factors as the CCPA).

### ii.    Individual Questions

Notwithstanding the existence of important common questions, there are a number of significant individualized issues that weigh heavily and undermine the hoped-for benefits of the class action device. Blackbaud asserts Plaintiffs' proposed subclass involves highly individualized data issues regarding the purported customer "investigations," customer notice practices, whether the data identified was actually stored in the relevant customer backup file(s), and/or whether the recipient was a legal California resident. (ECF No. 520 at 36). Plaintiffs respond that Blackbaud has not presented any evidence "undermining any of the nine customer notices supporting Plaintiffs' Motion, and Blackbaud should not benefit from its decision not to obtain discovery from those customers when its own Initial Disclosures and discovery identified them." (ECF No. 525 at 20).

The Court finds Plaintiffs' argument unpersuasive. Plaintiffs bear the burden of establishing that the requirements of Rule 23 are met "through evidentiary proof." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Plaintiffs maintain that Blackbaud has evidence related to the scope of its customers' investigations in the data breach to support the reliability of the customer notices, as indicated by Blackbaud's internal scripts for communicating with impacted customers. (ECF No. 525 at 16). However, these communication scripts do not provide insight into the actual investigations undertaken by the nine customers relevant to Plaintiffs' proposed CCPA Subclass. Instead, they merely illustrate Blackbaud's guidance to these customers.

Even if the Court were to assume the nine Blackbaud customers at issue conducted meaningful investigations, the notice letters do not state that individual data was "nonencrypted *and* nonredacted" as required by the CCPA. Cal. Civ. Code § 1798.150(a)(1) (emphasis added). Plaintiffs' assert that the notice letter constitute "common evidence" of "which California

14

consumers 'nonencrypted and nonredacted personal information was subject to an unauthorized access and exfiltration, theft, or disclosure.'" (ECF No. 514 at 39). Yet, the nine exemplar notices relied on by Plaintiffs contain varying language regarding the breach. To demonstrate, notice letters from four of the customers state that the relevant Blackbaud file was "unencrypted[,]" but they do not mention whether the exposed information was redacted. (ECF Nos. 508-6 at 6; 508-7 at 2; 508-10 at 2; 508-11 at 2). The exemplar notice from the Seven Hills School does state that Blackbaud initially informed the School that the information was encrypted, but later determined "this was not the case," however, the letter does not mention whether the information was redacted. The notice also states that the School's investigation "determined that the Blackbaud backup file *may have* contained some of your information[,]" but later says "[t]he Blackbaud file involved contained your name and Social Security number." (ECF No. 508-12 at 2).

The other four notices do not state whether the relevant information was encrypted or redacted, (ECF Nos. 508-4 at 2; 508-5 at 2; 508-8 at 2; 508-9 at 2), with one letter equivocating that the recipient's information was located in fields that "may have been viewable to the unauthorized person[,]" (ECF No. 508-8 at 2). The examplar notice from International Medical Corps informs recipients that the relevant file contained their name and "financial account information from a scanned check for the account ending in <<b2b_text_1(LastFourDigits)>>, as well as your <<b2b_text_2(ImpactedData)>>." (ECF No. 508-9 at 2). Based on this document, it is unclear whether the information qualifies as "Personal Information" under the CCPA, which includes an "[a]ccount number or credit or debit card number, *in combination with* any required security code, access code, or password that would permit access to an individual's financial account." Cal. Civ. Code § 1798.81.5(d)(1)(A)(iii) (effective Jan. 1, 2020 to Dec. 31, 2021) (emphasis added).

Critically, the notice sent to Plaintiff Estes stated that "Crystal Stairs' investigation determined that the involved Blackbaud systems contained your name and Social Security number or tax identification number." (ECF No. 508-17 at 2). The notice does not mention whether Plaintiff Estes' information was redacted or encrypted. Accordingly, individualized inquiries will be necessary regarding the scope and reliability of Blackbaud customers' investigations, and whether the data was unencrypted and unredacted pursuant to the CCPA, necessitating additional discovery. Due to the difficulty of such inquiries, these common questions are qualitatively significant.

Plaintiffs essentially ask the Court to assume the California customer notices serve as proof of class member standing and insist that Blackbaud must provide evidence to overcome this assumption. Not so. Granted, Plaintiffs are not required to prove the standing of putative class members at this stage of litigation. Nonetheless, Plaintiffs will ultimately be responsible for proving that class member data was accessed and exfiltrated, stolen, or disclosed. Even though Plaintiffs need not prove this element currently, they must demonstrate that the elements of their claim are "capable of proof at trial through evidence that is common to the class rather than individual" to its members. *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 345 (D. Md. 2012), *amended*, 962 F. Supp. 2d 840 (D. Md. 2013) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008)). Plaintiffs cannot rely on the customer notices as common evidence without supporting the reliably of such notices.

Additionally, the individualized inquiries necessary to determine whether the notices are reliable and class member data was in fact accessed and exfiltrated to support a cause of action under the CCPA undermines the propriety of a representative action. "Overly general class definitions also threaten the assurance that class members will receive fair and adequate

representation." *Stafford v. Bojangles' Rests., Inc.*, No. 23-2287, 2024 WL 5131108, at *7 (4th Cir. Dec. 17, 2024). Plaintiffs present only one named Plaintiff for the CCPA Subclass who received a notice from one of Blackbaud's customers. Evidence of the investigation of this customer to prove Plaintiff Estes' claim cannot be used as common proof to show that each of the other eight customers conducted similar investigations and actually determined that constituent data was accessed and exfiltrated. Thus, if Plaintiff Estes is successful in this showing, class certification would improperly extend this finding to other customers. If Plaintiff Estes is not successful, certification would extend this finding to class members of other customers who may have in fact conducted a full investigation and determined that the relevant data was taken in accordance with the requirements of the CCPA. The Court simply cannot assume, without more, that all individuals who received a notice letter from a California Blackbaud customer have a viable claim against Blackbaud, without risking the inclusion of individuals "who would not have a right to recovery but for the sweeping scope of the class certification itself." *Stafford*, 2024 WL 5131108, at *6.

Although proof of data access and exfiltration will ultimately be a merits issue, the "common question" of whether class member data was accessed and exfiltrated—a question at the heart of this litigation—is not one that can be answered with common proof. *Thorn*, 445 F.3d at 323 (the "question at this stage" is not whether the district court will arrive at the same conclusion in resolving class member issues, "but whether it can resolve those issues in a class-wide manner"); *see also Piotrowski*, 2015 WL 4602591, at *20 ("Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out") (cleaned up). The complexities discussed herein present significant individual questions that are not susceptible to common proof.

### 3. Superiority

Based on the predominance of individual questions and the ascertainability issues discussed above, the Court has serious doubts about the superiority of class certification in this matter. Plaintiffs are required to show that proceeding as a class "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Superiority "depends greatly on the circumstances surrounding each case," but "requires the court to find that the objectives of the class-action procedure really will be achieved." *Soutter*, 307 F.R.D. at 217 (quoting *Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 274 (4th Cir. 2010)). In determining the superior method of adjudication, the court considers (1) class members' interests in individually controlling the case; (2) the existence of other related litigation; (3) the desirability of litigating in the particular forum; and (4) manageability. Fed. R. Civ. P. 23(b)(3).[8]

Plaintiffs' shifting theories of ascertainability, and the specific issues discussed herein illustrate the manageability problems of class treatment in this case. Overall, the Court is unconvinced that common questions in this case overcome the individual issues presented by the proposed subclass. As such, a class action is not superior in the efficient adjudication of the controversy. The Supreme Court has noted that, through Rule 23(b)(3), "the Advisory Committee sought to cover cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Products, Inc. v. Windsor*, 521 U.S.

---

[8] The Fourth Circuit has emphasized that these considerations are not exclusive. *See EQT Prod. Co. v. Adair*, 764 F.3d at 371 (considering barriers to individual litigation, benefit to defendant of resolving claims in a single forum, prevalence of state law claims and availability of state-law mechanisms, and whether defendant acted in bad faith towards individual claimants).

591, 615 (1997). The individualized issues and ascertainability issues in this case undermine the desirability of the class action mechanism in this case.

**B.     Plaintiffs' Proposed Rule 23(b)(2) CCPA Subclass**

    **1.     Impact of *Kadel* Decision**

Plaintiffs alternatively argue that their request to file a renewed class certification motion focused on injunctive relief is justified by the Fourth Circuit's decision in *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024). They allege the case constitutes a "change in law [that] further supports the Court's consideration of Plaintiffs' renewed motion." (ECF No. 508 at 14). The Fourth Circuit Court of Appeals issued its opinion in *Kadel* on April 29, 2024, finding in part that there was "no threshold ascertainability requirement in this Rule 23(b)(2) case, which seeks *only* declaratory and injunctive relief from a discriminatory policy." *Kadel*, 100 F.4th at 161 (emphasis added). In so holding, the Fourth Circuit explained that the ascertainability requirement "makes sense when issues of notice and damages are at play, i.e., for 23(b)(1) and 23(b)(3) classes." *Id.* at 160. However, the court went on to agree with other courts of appeal which have consistently declined to impose the ascertainability requirement for injunctive relief classes. Such holdings, the court reasoned, are supported by the Advisory Committee Notes which state that "illustrative" examples of a Rule 23(b)(2) class "are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, *usually one whose members are incapable of specific enumeration*." *Id.* at 161 (citing Fed. R. Civ. P. 23 advisory committee's note (1966) (emphasis original)).

Initially, if *Kadel* indeed constitutes a change in law, the Court questions whether such a change has any impact on an argument Plaintiffs did not raise previously. The Court notes that Plaintiffs' initial Motion for Class Certification did not request Rule 23(b)(2) certification with

respect to their CCPA claims. Plaintiffs' initial Motion focused only on injunctive relief sought for the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) claim. (ECF No. 293 at 41–43). Plaintiffs only reference to injunctive relief under the CCPA was a footnote stating the availability of injunctive relief for claims under its other causes of action, including the CCPA. (*Id.* at 51 n.29). And, even in their Proposed Renewed Motion for Class Certification, Plaintiffs devote only two pages out of thirty-four to their injunctive relief request. (ECF No. 514 at 43–44). Plaintiffs made the strategic choice to limit their request for certification of an injunctive relief class to their FDUTPA claim instead of arguing in the alternative. The Court is skeptical of allowing new argument simply because Plaintiffs' prior argument was unsuccessful. *See Potter v. Potter*, 199 F.R.D. 550, 553 (D. Md. 2001) (noting that when litigants seek relief from the court, "they are obligated to insure that [their filings are] complete with respect to facts, law and advocacy"). Even so, the Court's preliminary examination of Plaintiffs' argument for certification of a Rule 23(b)(2) class exposes fatal flaws.

### 2. Suitability of Rule 23(b)(2) Certification

If *Kadel* constitutes a change supportive of Plaintiffs' request, the Court must also determine whether Plaintiffs' proposed CCPA Subclass is appropriate for certification under 23(b)(2). Injunctive relief classes focus on the uniform conduct of the defendant and the indivisible nature of the remedy sought. Where the request for monetary relief predominates, Rule 23(b)(2) certification is inappropriate. *See Thorn*, 445 F.3d at 331–32. But where monetary relief is "incidental" to injunctive or declaratory relief, Rule 23(b)(2) certification may be permissible. *Berry v. Schulman*, 807 F.3d 600, 609 (4th Cir. 2015) (citing *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998)). This rule aligns with the underlying principle of Rule 23(b)(2) classes: "If a class action is more about individual monetary awards than it is about uniform

injunctive or declaratory remedies, then the presumption of cohesiveness breaks down and the procedural safeguard of opt-out rights becomes necessary." *Id.* (citations omitted).

Blackbaud avers that Plaintiffs cannot seek to certify a Rule 23(b)(2) subclass under the CCPA because they principally seek monetary relief. (ECF No. 520 at 44). Plaintiffs counter that they do not primarily seek monetary damages because statutory damages do not predominate over injunctive relief where the amount of damages depends on the defendant's conduct and is "uniform with respect to each of the class members." (ECF No. 525 at 23). The Amended Consolidated Class Action Complaint requests relief for Plaintiffs' CCPA claims in the form of injunctive relief and "statutory damages or actual damages, whichever is greater, pursuant to Cal. Civil Code § 1798.150(a)(1)(A)." (ECF No. 195 ¶¶ 765, 766). As set forth above, Plaintiffs' initial Motion for Class Certification focused only on injunctive relief sought for the FDUTPA claim. (ECF No. 293 at 41–43). And, even in their Proposed Renewed Motion for Class Certification, Plaintiffs take only a passing shot at their injunctive relief request. (ECF No. 514 at 43–44). Plaintiffs' failure to request injunctive relief for their CCPA claims in their prior motion undermines their contention that they do not primarily seek monetary relief.

### 3.    Rule 23(b)(2) Requirements

Finally, even if the Court were to find the *Kadel* decision a change in law sufficient to justify Plaintiffs' request and that Plaintiffs' request for monetary damages does not predominate over their request for injunctive relief, a facial review of Plaintiffs' proposed motion illustrates its futility. A class action may be maintained pursuant to Rule 23(b)(2) if Plaintiffs show Blackbaud has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). As the party seeking class certification, Plaintiffs must present evidence and

demonstrate compliance with Rule 23 by a preponderance of the evidence. *Cheng v. Liu*, No. 23-1806, 2024 WL 3579606, at *2 (4th Cir. July 29, 2024) (quoting *Career Counseling, Inc. v. AmeriFactors Fin. Grp., LLC*, 91 F.4th 202, 206 (4th Cir. 2024)). While the plaintiffs bear the burden of demonstrating compliance with Rule 23, the Court "has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." *EQT Prod. Co.*, 764 F.3d at 358 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011)).

Plaintiffs argue that Blackbaud has acted or refused to act on grounds that apply generally to the class by failing to protect class members' personal information by employing reasonable data security measures. (ECF No. 514 at 43–44). Plaintiffs further allege that Blackbaud failed to provide accurate information concerning the ransomware attack in its disclosures to class members sufficient to allow them to protect themselves through mitigation efforts or other diligence. (ECF No. 195 ¶ 568). As such, Plaintiffs insist that injunctive relief is needed to remediate Blackbaud's inadequate and ongoing security issues, which will "affect all subclass members equally in one fell swoop." (ECF No. 514 at 44). Plaintiffs' arguments ignore the realities of this case and consequently fall short of Rule 23(b)(2)'s requirements.

First, Plaintiffs have not set forth any facts to support the claim that CCPA Subclass member data is at risk of an imminent breach. Plaintiffs opine that their evidence "push[es] the threatened injury of future identity theft beyond the speculative to the sufficiently imminent." (ECF No. 525 at 22). Yet, Plaintiffs do not cite to any evidence or set forth any facts to show Plaintiff Estes or other putative subclass members' personal data is being collected or housed by Blackbaud or its customers creating an imminent risk of another breach of their personal information.

Turning to the risk of future identity theft, Plaintiffs note that the Court already found Plaintiff Estes' allegations sufficient to confer standing. Specifically, Plaintiffs explain that shortly

after Plaintiff Estes' information was stolen, someone opened a checking account in her name, (ECF No. 525 at 22), she began receiving phishing attempts, lost access to several of her accounts (such as PayPal), and received notifications that a checking account was opened in her name and of fraudulent purchase attempts, (ECF No. 514 at 25). The Court previously determined that Plaintiffs alleged sufficient injury to confer standing for Plaintiff Estes' *damages claims* at the motion to dismiss stage; but "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Moreover, the Court's previous order expressly limited its analysis to the traceability prong of Article III standing and declined to consider Blackbaud's challenge to Plaintiffs' standing for injunctive relief. (ECF No. 121 at 12–13, 12 n.14).

The purpose of injunctive relief "is to prevent future harms rather than redress those that have already occurred." *Erie Ins. Exch. v. Md. Ins. Admin.*, 105 F.4th 145, 150 (4th Cir. 2024). Therefore, even if the Court found Plaintiffs have sufficiently alleged standing to seek retrospective damages, it does not automatically follow that Plaintiffs have stated a claim for injunctive relief. "A plaintiff who seeks . . . to enjoin a future action must demonstrate that he is immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *Beck v. McDonald*, 848 F.3d 262, 277 (4th Cir. 2017) (quoting *Lebron v. Rumsfeld*, 670 F.3d 540, 560 (4th Cir. 2012)).

Moreover, Plaintiffs have not shown injunctive relief is appropriate for the CCPA Subclass. The Amended Consolidated Class Action Complaint requests injunctive relief under the CCPA requiring Blackbaud to:

> (1) employ adequate security practices consistent with law and industry standards to protect the California Subclass members' Private Information; and

> (2) to complete its investigation, and to issue an amended statement giving a detailed explanation that confirms, with reasonable certainty, what categories of data were stolen and accessed without the California Subclass members' authorization, along with an explanation of how the data breach occurred.

(ECF No. 195 ¶ 765). Plaintiffs do not refine the relief requested in their Proposed Renewed Motion for Class Certification or their Motion for Leave to File.

Blackbaud argues that Plaintiffs' request for injunctive relief is moot because "the way the threat actor accessed Blackbaud's systems in 2020 was long ago remediated." (ECF No. 520 at 42). Additionally, Blackbaud has agreed to extensive other voluntary measures with state and federal regulators to ensure the effectiveness of its information security program. (*Id.*). Plaintiffs respond that the changes Blackbaud has agreed to implement through other settlements do not fully address the relief they request. (ECF No. 525 at 23). Specifically, Plaintiffs claim the agreements do not require Blackbaud to: "(i) issue an amended statement providing a detailed explanation of the breach, including the specific categories of data stolen and the method of breach; (ii) make affirmative efforts to correct past, incomplete, or inaccurate statements about the breach; (iii) conduct annual (as opposed to biennial) audits of data security systems; or, most importantly, (iv) notify all customers and constituents whose legacy data Blackbaud still maintains." (*Id.*). Overall, Plaintiffs insist that "[a]n order requiring Blackbaud to remedy these security inadequacies will affect all subclass members equally[.]" (ECF No. 514 at 44). The Court disagrees.

First, Plaintiffs do not identify any possible action the Court could require Blackbaud to take that would protect CCPA Subclass members from the threat of future identity theft based on the information allegedly taken during the 2020 data breach. Plaintiffs fail to articulate how requiring Blackbaud to change its security practices or provide notice of the facts surrounding the

2020 data breach would protect Plaintiff Estes or any other putative class member from future harm. Despite arguing that requiring Blackbaud to publish a corrective notice regarding the 2020 breach "would significantly help to protect class member data, as Blackbaud's customers could elect to use more secure services[,]" (ECF No. 514 at 44), Plaintiffs have not set any facts to support the assertion that Plaintiff Estes information is *currently* at risk. Even if the Court were to accept as true that such notice would prompt Blackbaud's customers to change providers, the Court cannot assume this would have any impact on CCPA Subclass members without any proof that their data is currently housed with these customers and therefore at imminent risk.

Second, requiring Blackbaud to change its current security practices, investigate the prior breach, and publish information regarding the prior breach would not protect Plaintiff Estes or other putative class members from future identity theft stemming from information allegedly exfiltrated in the 2020 breach. Over four years have passed since the data breach at issue in this case. And "as the breaches fade further into the past," Plaintiffs' "threatened injuries become more and more speculative." *Beck*, 848 F.3d at 275.

In sum, the Court is not convinced that the Fourth Circuit's *Kadel* decision supports Plaintiffs' request for injunctive relief not argued in their prior motion. Moreover, Plaintiffs have not shown their request for injunctive relief under the CCPA predominates over their request for damages, or that they can meet the requirements for certification of a class pursuant to Rule 23(b)(2).

## C.    **Potential Prejudice to Blackbaud**

The Court weighs Plaintiffs' proffered reasons for requesting further argument on class certification with the potential impact on Defendant and judicial economy, keeping in mind the stage of the litigation and the purpose of consolidating cases for multidistrict litigation. Blackbaud

avers that discovery would be needed from every Blackbaud customer that sent certain notices to California addressees. (ECF No. 520 at 24). Blackbaud argues it would then be entitled to explore the accuracy of any purported customer investigation into potentially impacted data and associated constituents, which would require depositions of witnesses from each customer and associated expert analysis of the underlying data. (*Id.*). Specifically, Blackbaud opines that there are individual issues related to the customer notice practices, whether the data identified was actually stored in the relevant backup files, and whether the recipient was a legal California resident. (*Id.*). The Court agrees that additional discovery would be needed.

As Blackbaud points out, Plaintiffs attached new evidence to their Motion for Leave in the form of notice letters and by proffering a new report from a previously undisclosed witness.[9] Although the notice letter templates have been publicly posted on the California Attorney General's website for years, Plaintiffs do not appear to have conducted any discovery directed at the Blackbaud customers who distributed these letters. Plaintiffs argue that Blackbaud has not presented any evidence "undermining any of the nine customer notices supporting Plaintiffs' Motion, and Blackbaud should not benefit from its decision not to obtain discovery from those customers when its own Initial Disclosures and discovery identified them." (ECF No. 525 at 20). Importantly, it is Plaintiffs' burden, not Blackbaud's, to show the proposed class meets the requirements of Rule 23. *See, e.g.*, *Thorn*, 445 F.3d at 321.

The Court agrees with Blackbaud that additional discovery would be needed, at a minimum, to gather information regarding each customer's process for investigating and

---

[9] Plaintiffs also contend that they have not failed to disclose an expert because the declaration merely presents Plaintiffs' notice plan and does not constitute expert testimony. (ECF No. 525 at 13). Blackbaud correctly notes that the witness refers to herself as a "judicially recognized legal notice expert" in her declaration. (ECF No. 520 at 33 n.9 (citing ECF No. 508-13)).

determining who should receive the notice, and the reliability of the customers' processes to confirm class member data was in fact accessed. Without evidence that these customers actually investigated the data stored in the relevant backup file before sending the notices, the court would be certifying a class with an unknown ratio of class members whose data was not actually involved in the breach. Additional briefing on class certification and reopening of discovery, however limited, would be prejudicial to Blackbaud.

## D.    Judicial Economy

The Court must also remain cognizant of the realities and unique problems faced in an MDL which render effective case management vital. The Fourth Circuit recognizes a district court's "discretion in coordinating and administering multi-district litigation." *In re Showa Denko K.K. L-Tryptophan Prods. Liab. Litig.-II*, 953 F.2d 162, 165 (4th Cir. 1992). The MDL device is intended to allow federal courts to "conserv[e] judicial resources in situations where multiple cases involving common questions of fact [are] filed in different districts." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 648 (4th Cir. 2018) (citing *In re Food Lion, Inc., Fair Labor Standards Act Effective Scheduling Litig.*, 73 F.3d 528, 531–32 (4th Cir. 1996)). Such transfers are made by the Judicial Panel on Multidistrict Litigation (JPML) based "upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C.A. § 1407(a). As the JPML stated in its Transfer Order, centralization under 28 U.S.C. § 1407 serves the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. (ECF No. 1 at 1). In centralizing the proceedings, the JPML noted centralization would also "eliminate duplicative discovery; prevent inconsistent pretrial

rulings, including with respect to class certification; and conserve the resources of the parties, their counsel, and the judiciary." (*Id.* at 2).

As stated above, this case has been ongoing for almost four years and discovery has been closed for two years. Plaintiffs' initial Motion for Class Certification was filed on December 16, 2022 (ECF No. 293). Blackbaud filed its Response in Opposition on June 8, 2023 (ECF No. 329), and Plaintiffs submitted their Reply on October 20, 2023 (ECF No. 414). After briefing on the Motion concluded, the Court held a three-day hearing from March 6–8, 2024. During this period, Plaintiffs reframed their arguments regarding ascertainability several times by presenting new proposals at the motions hearing and in ancillary motions practice related to exclusion of experts. (*See, e.g.*, ECF No. 497 at 19 (noting that Plaintiffs presented differing methods of identifying class members in arguing against exclusion of expert testimony); ECF No. 496 at 29–30 (Plaintiffs proposed creation of website for the first time at the motions hearing)).

Limitations on motions practice are necessary because otherwise there would be "no conclusion to motions practice, each motion becoming nothing more than the latest installment in a potentially endless serial that would exhaust the resources of the parties and the court—not to mention its patience." *Pinney v. Nokia, Inc.*, 402 F.3d 430, 453 (4th Cir. 2005) (quoting *Potter v. Potter*, 199 F.R.D. at 553). After considering several versions of Plaintiffs' theories, the Court stated in its Order Denying Plaintiffs' Motion for Class Certification that it would "not permit Plaintiffs to continually alter their ascertainability proposals in a manner that deprives Defendant of its ability to meaningfully defend itself." (ECF No. 497 at 42). Allowing the serial amendment of Plaintiffs' theory of class certification would do just that.

Ultimately, the Court finds that allowing successive argument on class certification based on an unchanged record this late in the litigation would be prejudicial to Blackbaud and against

the interests of judicial economy. Plaintiffs had ample opportunity to present their best evidence and arguments in favor of class certification during the ten months spent briefing their initial Motion for Class Certification, and Rule 23(c)(1) "is not a Trojan Horse by which Plaintiffs may endlessly reargue the legal premises of their motion." *Fitzwater.*, 2020 WL 3620078, at *3 (quoting *Gardner v. First Am. Title Ins. Co.*, 218 F.R.D. 216, 218 (D. Minn. 2003)). In short, Plaintiffs have not offered sufficient grounds for reopening class certification and further postponing resolution of this matter.

## IV.    CONCLUSION

Based on the foregoing, the Court hereby denies Plaintiffs' Motion for Leave to File a Renewed Motion for Class Certification (ECF No. 508).

IT IS SO ORDERED.

December 30, 2024
Columbia, South Carolina

Joseph F. Anderson, Jr.
United States District Judge